NOT FOR PUBLICATION

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| KELLY D. GRIECO et als., | : |
| Plaintiffs, | : |
|  | :  Civil Action No. 06-cv-4077 (PGS) |
| v. | : |
|  | : |
| NEW JERSEY DEPARTMENT OF EDUCATION, et als., | :  OPINION |
|  | : |
| Defendants. | : |

**SHERIDAN, U.S.D.J.**

Plaintiffs, three minors with Down Syndrome, their parents, and several organizations, filed this Class Action Complaint, alleging a systemic failure on the part of the State of New Jersey to include the plaintiffs and proposed members of the class in the regular classroom and/or least restrictive environment. The New Jersey Department of Education ("NJDOE"), New Jersey State Board of Education, and various State officials (collectively referred to as the "State Defendants") and the Jefferson Township School District, Jefferson Township Board of Education, and various Township officials (collectively referred to as the "Jefferson Defendants") move to dismiss on several grounds, including failure to exhaust administrative remedies and violation of the statute of limitations.

I.

Plaintiff Vincenzo Grieco ("Grieco"), a nine-year-old boy diagnosed with Down Syndrome, entered the Arthur Stanlick Elementary School in the Jefferson Township School District in September 2002. Classified as multiply-disabled, Grieco was found eligible for the pre-school

disabled program with special services in speech and occupational therapy. During his first academic year, 2002-2003, pursuant to a mediated agreement with the district, Grieco was placed in a regular kindergarten class in the morning and then in a multiply-disabled class for the remainder of the day. For the 2003-2004 school year, Grieco's parents sought full inclusion for their son, despite the district's belief that Grieco should be placed in a multiply-disabled class for the full day. The parties agreed to place the child in a regular first grade classroom. At Grieco's next Individualized Education Plan ("IEP") meeting, in March 2004, it was recommended that Grieco be placed in a multiply-disabled class with mainstreaming[1] for special subjects, lunch, assemblies, and field trips for the 2004-2005 academic year. Disagreeing with the assessment, Grieco's parents filed a Petition for Due Process with the Department of Education. On August 30, 2004, the administrative law judge rendered a written opinion upholding the IEP proposed by the district. The following year, for the 2005-2006 academic year, Grieco was placed in a multiply-disabled class for the full day. Currently, the child spends forty percent of the day in a regular class, including science and social studies, and is placed in a fully segregated multiply-disabled class for math, reading, and language arts.

Plaintiff Simone Boucher ("Boucher") is a six-year-old girl with Down Syndrome attending school in the Metuchen Public School system. Identified as multiply disabled with demonstrated delays in communications, motor and cognitive skills, Boucher was placed in a pre-school class for the disabled for one-half of the school day for the 2005-2006 school year. Boucher's proposed IEP for the current 2006-2007 school year placed her in a regular education classroom for one-half of the

---

[1] "Mainstreaming" refers to the Individuals with Disabilities Education Act's ("IDEA"), 20 U.S.C. § 1400 et seq., requirement that a disabled child be placed in the least restrictive environment ("LRE") that will provide a meaningful educational benefit.

school year with a paraprofessional and an extended day program in a resource room. Refusing to sign the IEP, Boucher's parents believed that the district's recommendation failed to include appropriate supports to permit the child to be successfully integrated into a regular classroom. After filing for due process on October 2, 2006, the parties reached a settlement through the Office of Special Education Programs on October 24, 2006.

Plaintiff Christopher Bricese ("Bricese"), a thirteen-year-old boy with Down Syndrome, attending school in the Hamilton Township School District, is classified as mildly cognitively impaired with delays in speech, auditory processing, memory, and expressive language. Throughout elementary school, Bricese was fully included in regular education. However, in middle school, Bricese spent less than forty percent of the school day in the general education curriculum. It is maintained that the district seeks to further segregate Bricese by placing the child in a multiply-disabled program with a life skills curriculum. Rejecting the recommendation, Bricese's parents retained an expert to conduct a functional assessment of their son in June 2006. The expert recommended that the teacher and aide who provide the child's special education receive training in an appropriate "social skills" training program. The district agreed to conduct a functional behavioral assessment in the beginning of the 2006-2007 school year and develop a more detailed behavioral intervention plan to help redirect and manage any inappropriate behavior. However, it is alleged that the one-on-one aide has not redirected the behavior and despite the fact that the "social training" provided for in the IEP is not working, the district has refused to amend the IEP.

With the exception of the first count, which seeks to challenge Grieco's placement and support services, the plaintiffs couch their Second Amended Complaint as a class action alleging that defendants created and maintain a system of public education that fails in the mandates of the

Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 et seq., and the related federal and state statutes. According to plaintiffs, the lawsuit is an attempt to address the systemic failures of defendants to provide for meaningful inclusion for school-age children with Down Syndrome in the State of New Jersey. Plaintiffs maintain that they have an inalienable right to be included in the New Jersey classrooms with their typical peers and that they have been denied the right to be educated in regular classrooms with typically developing classmates, and to be provided with supplementary aides, support services, and accommodations as required to achieve such inclusion. Although plaintiffs sue on behalf of all Down Syndrome students, the statistics relied upon in the Second Amended Complaint concern all disabled children, a far broader class. Evidently, certain government statistics show fewer than five percent (5%) of New Jersey's disabled children are integrated into regular classrooms with children who are not disabled for eighty percent (80%) or more of the school day. This number, according to plaintiffs, is less than half the national average of approximately thirteen percent (13%). It is stated that New Jersey completely segregates almost twenty-four percent (24%) of its children with disabilities into separate and segregated public and private school facilities which serve only children with disabilities. Further, although the population of New Jersey is less than three percent (3%) of the entire United States population, eleven percent (11%) of segregated placements nationally are New Jersey students. As a result of these statistics, the plaintiffs believe broad systemic relief is necessary. The relief sought (as stated in the Second Amended Complaint) includes to permanently enjoin and require:

> (1) the State Defendants to establish and maintain qualifications to ensure that personnel are appropriately and adequately prepared and trained; (2) the State Defendants to ensure that each township and district takes measurable steps to recruit, hire, train, and retain highly qualified personnel to provide plaintiffs' special education and related

services in the general education classroom to the maximum extent appropriate; (3) the State Defendants to determine whether each township and district is affording members of the class the opportunity to receive specialized instruction and related services in regular classes with the appropriate supports and services, adaptations and modifications; (4) the State Defendants to determine whether each township and district is improperly refusing to provide specialized instruction and related services in the regular classes with the appropriate supports and services, adaptations and modifications, and to ensure that prompt and effective corrective action is taken in those cases where members of the class are denied an appropriate education with the necessary specialized instruction and supports and services; (5) the State Defendants to ensure that each plaintiff member of the class receives special education in a regular classroom to the maximum extent appropriate, and that his or her removal from the regular classroom occurs only when the nature or severity of the disability is such that education in regular classes with the use of supplementary aid and services cannot be achieved satisfactorily; (6) the State Defendants to submit a plan for court approval that describes the actions they will take to ensure that townships and districts implement the requirements of the IDEA and that members of the class are not unnecessarily excluded from the regular classes; (7) the State Defendants to require all townships and districts to immediately hire an inclusion facilitator with expertise in successfully including students with disabilities who will provide initial and ongoing training to educational, professional and administrative staff on inclusion; (8) the State Defendants to require all townships and districts to immediately hire an independent child study team to work parallel with that district's Child Study Team to ensure that there will be systemic changes in that district with regard to the inclusion of children with disabilities; (9) the State Defendants to require all townships and districts to conduct full functional behavioral assessments of any child with a disability who exhibits inappropriate behavior, and who will monitor the data as it is collected to develop behavior intervention programs that incorporates positive behavioral approaches, as well as train staff on the implementation of the plan; (10) the State Defendants to immediately produce and effectuate a plan for state level monitoring of inclusion programs in the townships and districts; and (11) the State Defendants to take an immediate and complete remediation for the educational system as it pertains to inclusion for the class.

With these allegations and proposed remedies in mind, the plaintiffs sue based on four separate

statutes.

II.

The IDEA and section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §794, provide equivalent requirements. The IDEA provides an affirmative duty to provide education, whereas the Rehabilitation Act prohibits discrimination against the disabled. *W.B. v. Matula*, 67 F.3d 484, 492-93 (3d Cir. 1995), *abrogated on other grounds by*, *A.W. v. The Jersey City Public Schools*, 2007 WL 1500335 (3d Cir. 2007). The third act under which the plaintiffs sue is the Americans with Disabilities Act (ADA), 42 U.S.C. §12101-12. Like section 504, the ADA prohibits discrimination against the disabled. While these causes of action make up the gravamen of the plaintiffs' Complaint, plaintiffs also assert a cause of action under the New Jersey Law Against Discrimination (NJLAD), *N.J.S.A.* 10:5-1 et seq.

The IDEA was enacted "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs." 20 U.S.C. § 1400(d)(1)(A). It requires each state to provide disabled children with a "free appropriate public education" ("FAPE"). *Id.* § 1412(a)(1); *Florence County Sch. Dist. Four v. Carter*, 510 U.S. 7, 9 (1993). States must offer "educational instruction specially designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child to 'benefit' from the instruction." *Bd. of Educ. v. Rowley*, 458 U.S. 176, 188-89 (1982); *see also*, 20 U.S.C. § 1401(9). The program of education offered to the student need not have to be the best available, but must "confer some educational benefit." *Rowley*, 485 U.S. at 200. To this end, a state must conduct "a full and individual initial evaluation" of the child, and develop an Individualized Education Plan ("IEP") before implementation of any special education

program. 20 U.S.C. § 1414(a)(1)(A). An IEP is a detailed instruction plan tailored to address the child's educational needs, and serves as the "primary mechanism" to ensure that a disabled child receives a FAPE. *Susan N. v. Wilson Sch. Dist.*, 70 F.3d 751, 756 (3d Cir. 1995); see also 20 U.S.C. §§ 1401(14), 1414(d). Importantly, an IEP must provide for "significant learning" and confer a "meaningful benefit" to satisfy the requirements of a FAPE. *T.R. v. Kingwood Twp. Bd. of Educ.*, 205 F.3d 572, 577 (3d Cir. 2000). The "IDEA's central goal is that disabled students receive an appropriate education, not merely an appropriate IEP." *Ridgewood Bd. of Educ. v. N.E. ex rel. M.E.*, 172 F.3d 238, 250 (3d Cir. 1999).

While the IDEA sets forth an affirmative duty to provide an appropriate education to disabled students, §504 of the Rehabilitation Act is a "negative prohibition against disability discrimination in federally funded programs." *Matula*, 67 F.3d at 492. However, "[t]here appear to be few differences, if any, between IDEA's affirmative duty and §504's negative prohibition." *Id.* at 492-93.

To establish a violation of §504, a plaintiff must demonstrate that: (1) the student was disabled, (2) the student was "otherwise qualified" to participate in school activities, (3) the school receives "federal funded assistance," and (4) the student was excluded from participation in, denied benefits of, or subjected to discrimination at the school. *Ridgewood Bd. of Educ.*, 172 F.3d at 253. A plaintiff need not demonstrate intentional discrimination. *Id.* A finding of "bad faith or gross misjudgment" will stand in its stead. See *McKellar v. Commonwealth of Pa. Dep't of Educ.*, 1999 WL 124381, at *5 (E.D.Pa. 1999) (citing *Monahan v. Nebraska*, 687 F.2d 1164, 1171 (8th Cir. 1982)).

Finally, the ADA is similar to the Rehabilitation Act, but it "extend[s] section 504's anti-discrimination principles to public entities." *Helen L. v. DiDario*, 46 F.3d 325, 332 (3d Cir.

1995); see also 42 U.S.C. § 12132 ("[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."). All of the same elements, except the third element relating to federal funds, are required to establish a prima facie case of discrimination under the ADA. 42 U.S.C. § 12132. Like claims under §504, claims under the ADA do not require intentional discrimination; discriminatory effect can be the basis for ADA claims. See *Helen L.*, 46 F.3d at 331-32.[2]

### III.

Since plaintiffs seek relief under the IDEA, ordinarily they must exhaust their administrative remedies prior to exercising their rights under the Rehabilitation Act and the ADA. The exhaustion requirement contained within the IDEA is as follows:

> Nothing in this chapter shall be construed to restrict or limit the rights, procedures, and remedies available under the Constitution, the Americans with Disabilities Act of 1990 [42 U.S.C.A. § 12101 et seq.], title V of the Rehabilitation Act of 1973 [29 U.S.C.A. § 791 et seq.], or other Federal laws protecting the rights of children with disabilities, except that before the filing of a civil action under such laws seeking relief that is also available under this subchapter, the procedures under subsections (f) and (g) of this section shall be exhausted to the same extent as would be required had the action been brought under this subchapter.

20 U.S.C. § 1415(1). Here, plaintiffs' section 504 and ADA claims are based on the same conduct

---

[2] The State Defendants argue that plaintiffs' Title II claims under the ADA should be dismissed because Congress did not constitutionally abrogate state sovereign immunity under the Eleventh Amendment in enacting Title II. However, in reply, defendants acknowledged the binding, precedential Third Circuit decision in *Bowers v. NCAA*, 475 F.3d 524, 550-56 (3d Cir. 2007), wherein the Court concluded that Congress validly abrogated Eleventh Amendment immunity under Title II in the context of education. The Court need not address this argument any further.

8

that is the subject of their IDEA claims for which relief is available under IDEA. See *Weber v. Cranston Sch. Comm.*, 212 F.3d 41, 51-52 (1st Cir. 2000) (requiring plaintiff to exhaust IDEA procedures before filing retaliation claim under section 504).

This exhaustion rule serves the following important purposes:

> (1) permitting the exercise of agency discretion and expertise on issues requiring these characteristics; (2) allowing the full development of technical issues and a factual record prior to court review; (3) preventing deliberate disregard and circumvention of agency procedures established by Congress; and (4) avoiding unnecessary judicial decisions by giving the agency the first opportunity to correct any error.

*Hayes v. Unified Sch. Dist. No. 377*, 877 F.2d 809, 814 (10th Cir. 1989) (quoting *Association for Retarded Citizens, Inc. v. Teague*, 830 F.2d 158, 160 (11th Cir. 1987) (citations omitted)).

With the exception of Grieco's 2004-2005 academic school year (subject to Count 1 of the Second Amended Complaint), which is only one of at least three years complained of by this plaintiff, all other plaintiffs have failed to exhaust their administrative remedies. Plaintiffs contend that exhaustion of administrative remedies in this instance is inappropriate and futile.

Even though the policy of requiring exhaustion of remedies in the IDEA is a strong one, some exceptions have been recognized. In *Honig v. Doe*, 484 U.S. 305, 327, 108 S.Ct. 592, 606, 98 L.Ed.2d 686 (1988), the Court stated that "parents may bypass the administrative process where exhaustion would be futile or inadequate." Other exceptions exist where the issue presented is purely a legal question *(Lester H. by Octavia P. v. Gilhool*, 916 F.2d 865, 869-70 (3d Cir. 1990)), where the administrative agency cannot grant relief (*Komninos by Komninos v. Upper Saddle River Bd. of Educ.*, 13 F.3d 775 (3d Cir. 1994)), and where 'an agency has adopted a policy or pursued a practice of general applicability that is contrary to the law.'" *Association for Community Living in*

*Colorado v. Romer*, 992 F.2d 1040, 1044 (10th Cir. 1993) (quoting H.R.Rep. No. 296, 99th Cong., 1st Sess. 7 (1985)). In analyzing the futility and inadequate exceptions, Courts have found exhaustion to be excused "where plaintiffs allege structural or systemic failure and seek systemwide reforms." *Romer*, 992 F.2d at 1044; *see also*, *Beth V. by Yvonne V. v. Carroll*, 87 F.3d 80, 89 (3d Cir. 1996). "However, in pursuing these claims plaintiffs must show that the policies are contrary to law, and that the underlying purpose of exhaustion would not be serviced by requiring procedural compliance." *Ellenberg v. New Mexico Military Institute*, 478 F.3d 1262, 1277 (10th Cir. 2007). "[W]hat constitutes a systemic failure is not so easily defined." *Doe v. Arizona Dept. of Ed.*, 111 F.3d 678, 681 (9th Cir. 1997). The Ninth Circuit stated:

> [A] claim is "systemic" if it implicates the integrity or reliability of the IDEA dispute resolution procedures themselves, or requires restructuring the education system itself in order to comply with the dictates of the Act; but that it is not "systemic" if it involves only a substantive claim having to do with limited components of a program, and if the administrative process is capable of correcting the problem.

*Doe*, 111 F.3d at 681.

However, as explained recently by the Tenth Circuit, the IDEA is not "a virtual treasure trove providing disabled children with a limitless number of substantive rights." *Ellenberg*, 478 F.3d at 1274. As that court described:

> [i]t is a spending statute that imposes obligations on the states to provide certain benefits in exchange for federal funds. Although Congress has broad power to set the terms on which it disburses federal money to the States, ... when Congress attaches conditions to a State's acceptance of federal funds, the conditions must be set out "unambiguously." Courts engage in a two-step inquiry to determine if a state has satisfied its substantive IDEA obligations. First, has the State complied with the procedures set forth in the Act? And second, is the individualized educational program developed through the Act's procedures reasonably calculated to enable the child to receive

>       educational benefits?  If the answer to both is yes, the State has
>       complied with the obligations imposed by Congress and the courts
>       can require no more.

*Id.* at 1274-75 (internal quotations and citations omitted).

In this instance, the Court finds that exhaustion of remedies is required for the following reasons.  Courts most often follow the ordinary rule which states that a "factually intensive inquiry into the circumstances of each individual child's case...[is] best resolved with the benefit of agency expertise and a fully developed administrative record.'" *Romer*, 992 F.2d at 1044.  To overcome that rule, the plaintiffs must present some substantial evidence showing that exhaustion is futile.  The plaintiffs have not done so.  First, the plaintiffs' Second Amended Complaint relies largely on statistics (as mentioned above) which apply to a far broader class than proposed.  On its face, the relevance of these statistics is questionable.  If plaintiff is to rely on statistics going forward, the statistical sample must meet standards of reliability and trustworthiness.  Without deciding the issue, it appears that the most reliable data can be educed from the fully developed administrative record of Down Syndrome students.  Second, plaintiffs are required to prove the present system is flawed.  That evaluation should focus on outcomes achieved up and through the administrative law judge's decision.  Third, there is nothing in the administrative code or the IDEA that would prevent an administrative law judge from implementing much of the relief the plaintiffs seek, such as requiring a district to consult with an inclusion expert, or performing a full functional behavioral assessment of a Down Syndrome student. *See, Mrs. M. v. Bridgeport Bd. of Ed.*, 96 F. Supp. 2d 124, 135 (D.Conn. 2000).  Hence, there is an issue as to whether the relief sought fits within the systemic exception.  Fourth, to permit plaintiffs (like Boucher), who have resolved their IEP issues with the school district, to undo such settlements through a class action lawsuit contravenes long established

judicial policy which promotes the finality of settlements. Settlements, especially between parents, school administrators, child study teams and teachers, must be fostered rather than encouraging confrontation through lawsuits.

The plaintiffs rely heavily on *Gaskin v. Comm. of PA*, 1995 WL 154801 (E.D.Pa. 1995) in support of their position that exhaustion is not required. In that case, plaintiffs "challenged...Pennsylvania's system for educating students with disabilities." In rejecting exhaustion, the court found the relief sought could not be granted by any administrative body and, therefore, to require exhaustion would be senseless. The *Gaskin* case is distinguishable for several reasons. First, the *Gaskin* case was unduly delayed through the administrative process. At oral argument, it was represented that the matter had been pending for more than a decade. In New Jersey, there are relatively tight time frames for administrative decision making.[3] Secondly, although the relief sought here is broad, the scope of controversy is substantially more narrow than *Gaskin*. *Gaskin* involved all disabled children while this case concerns Down Syndrome children, a relatively smaller, more manageable, subset of disabled students. Third, the *Gaskin* Court was requested to institute an entirely new manner in which to comply with the IDEA. Here, the plaintiffs are seeking relief which augments or "tweaks" the present system. For example, plaintiffs request better

---

[3] The relevant time frames are as follows: (1) a request for a due process hearing shall be filed within two years of the date the party knew or should have known about the alleged action that forms the basis for the due process petition, N.J.A.C. 6A:14-2.7(a)(1); (2) the party against whom a request for a due process hearing is directed shall, within 10 days of the filing of a request for a due process hearing, provide a written response specifically addressing the issue(s) raised in the petition, N.J.A.C. 6A:14-2.7(d); (3) the district board of education shall have an opportunity to resolve the matter before proceeding to a due process hearing in a resolution meeting, which must be conducted within 15 days of the parent's request for a due process hearing, and concluded within 30 days thereafter, N.J.A.C. 6A:14-2.7(h), (h)(2), and (h)(4); and (4) a final decision shall be rendered by the administrative law judge not later than 45 calendar days after the conclusion of the 30-day resolution period, N.J.A.C. 6A:14-2.7(j).

oversight by the State, hiring inclusion experts, and better training for classroom teachers. These forms of relief leave the fundamental system of determining IEPs for Down Syndrome students intact. Lastly, the plaintiffs, here, do not argue that there is a total lack of inclusion of Down Syndrome students; their argument is that it is insufficient. Each of the named plaintiffs is educated with other school children of the same age for at least a portion of the school day. In *Gaskin* it is unclear whether inclusion was even a consideration in Pennsylvania at the time. The point is that plaintiffs' changes are aimed at the degree of inclusion. As such, the facts become more critical and the fully developed administrative record is essential.

The plaintiffs also rely on *New Mexico Ass'n for Retarded Children v. New Mexico*, 678 F. 2d 847 (10th Cir. 1982). In that case, the Court found that the only administrative relief granted to disabled students was reassignment of students within existing programs, and did "not include a restructuring of the State's system to comply with Section 504." *Id.* at 851. As a result of such inadequate procedures, systemic changes were at issue and the administrative proceedings would not be useful. Underlying the Tenth Circuit's concern were the six years of litigation which were "irretrievably lost" to the disabled student's detriment. Clearly, *New Mexico* is distinguishable for the reasons stated with regard to *Gaskin*.

The Court is persuaded by *Mrs. M. v. Bridgeport Bd. of Educ.*, 96 F.Supp.2d 124, where a Connecticut district court dismissed all but the individual plaintiffs in a class action complaint brought on behalf of minority children who allegedly were misidentified as mentally retarded, on account of plaintiffs' failure to exhaust administrative remedies. In that case, a due process hearing officer rejected Mrs. M.'s administrative complaint that the Bridgeport Board of Education (BBE) misidentified her daughter as mentally retarded instead of language impaired/learning disabled. Mrs.

M. sued the BBE under the IDEA, the Rehabilitation Act, Title II of the ADA, and 42 U.S.C. §1983, alleging that the hearing officer improperly denied her request for an out-of-district placement, rather than a self-contained class for children who were educable mentally retarded. After the initial complaint was filed, Mrs. M. amended the complaint to include the purported class. Plaintiffs alleged that BBE engaged in a pattern and practice of over-identifying minority school children as mentally retarded at a rate of more than three times the statewide average for such identification, while simultaneously failing to correctly identify the disabilities of children and provide them with a FAPE.

The court held that, with the exception of Mrs. M., the purported class failed to exhaust administrative remedies under the IDEA. More importantly though, the court found that the case did not involve a situation where the challenged policy or practice was incapable of being remedied through the available administrative process. BBE's alleged pattern and practice was subject to review by hearing officers on a case-by-case basis. If hearing officers detected an improper identification method, they could reject it. The court also rejected plaintiffs' argument that exhaustion was not required because the administrative procedures established by statute were inadequate to address the issues in the complaint. Other children who had allegedly been misidentified had been subsequently correctly identified through the appeal process. Plaintiffs' challenge, as interpreted by the court, went to the substantive determinations reached by the BBE concerning certain children, not to the structure of the system under which the identification was made. Finally, the court rejected plaintiffs' argument that requiring all of the class members to exhaust administrative remedies would be impractical and would have the effect of depriving parents of children with disabilities from bringing a class action under the IDEA. The court found nothing

in the record that any of the purported class members had been prevented from administratively challenging identifications made by BBE. The court held that "[s]imply by styling a case as a putative class action should not excuse compliance with the required exhaustion of administrative procedures under the IDEA." *Mrs. M.*, 96 F.Supp.2d at 135.

Such is the case presently before the Court. Just as the plaintiffs in *Mrs. M* cite to statistics that suggest that the BBE over-identify minority school children as mentally retarded at rate of more than three time the state-wide average for such identification, plaintiffs, here, maintain that fewer than five percent (5%) of New Jersey's disabled children are integrated into regular classrooms with children who are not disabled for eighty percent (80%) or more of the school day, which is less than half the national average of approximately thirteen percent (13%). In short, cases based on statistical analysis do not obviate the requirement to exhaust administrative remedies. In fact, taking these statistics as accurate, and assuming for the moment that the school districts are not including these students to the appropriate extent, such determinations "are classic examples of the kind of technical questions of educational policy best resolved with the benefit of agency expertise and a fully developed administrative record." *Hoeft v. Tucson Unified Sch. Dist.*, 967 F.2d 1298, 1305 (9th Cir. 1992).

The Court finds that plaintiffs' only legally cognizable injury under the IDEA is the state's failure to provide these children with a FAPE in the least restrictive environment. An individualized fact-intensive inquiry with the benefit of agency expertise and a fully developed administrative record as to each student is required to answer the question whether each student's IEP provides the appropriate accommodations in the least restrictive environment. It seems to this Court that plaintiffs claim that the percentage of time which each child is included in a regular class is

inadequate. This, however, can be rectified, if deemed appropriate, by an administrative law judge. Without the benefit of administrative records, the Court "cannot determine [] whether the thousands of children represented by the plaintiff class have been denied a free appropriate public education." *Romer*, 992 F.2d at 1045. To permit plaintiffs to circumvent the exhaustion requirement by merely alleging a systematic failure, without any logical mechanism to draw reasonable conclusions about individual needs with respect to such a large category of students, would undermine the IDEA and rationale for the exhaustion requirement. The Court is in agreement with *Romer* and *Mrs. M.* that framing a complaint as a class action challenge to a general policy does not automatically convert the case into the kind of systemic violation that renders the exhaustion requirement inadequate or futile. Moreover, the allegations sound more like a challenge to the substantive determination of the IEPs, and the inclusiveness and environment prescribed, than the structure of the system. The facts of this case require an individualized assessment and factually intensive inquiry into the circumstances of each individual child. The determination of whether the plaintiffs were, in fact, denied a FAPE would be more easily determined with the factual details of each particular child's case.

Therefore, the claims of Plaintiff's Boucher and Bricese, and their parents, in Counts Two through Five are dismissed, without prejudice, for failure to exhaust administrative remedies. Plaintiff Grieco will be permitted to proceed on all counts and the class action, but only with regard to the 2004-2005 school year, for which administrative remedies were exhausted.

IV.

The Jefferson Defendants maintain that the claim is barred by the statute of limitations. This argument lacks merit based on three recent cases which speak for themselves. *Lawrence Township*

*Board of Educ. v. New Jersey*, 417 F.3d 368, 370 (3d Cir. 2005); *P.S. v. Princeton Reg'l Schs. Bd. of Educ.*, 2006 WL 38938, at *2 (D.N.J. 2006); *R.G. v. Glen Ridge Bd. of Educ.*, 2005 WL 3274857, at *4 (D.N.J. 2005).

In addition, the Jefferson Defendants argue that plaintiffs did not serve them in a timely fashion and this is reason for dismissal. The Jefferson Defendants do not cite to any factual or legal support for its contention. The court is satisfied that service was proper. This motion based on the statute of limitations and service is denied.

V.

The Court rejects the defendants' argument that Grieco's parents do not have substantive rights to bring their action under the IDEA. The Supreme Court recently opined in the matter of *Winkelman ex rel. Winkelman v. Parma City School Dist.*, 127 S.Ct. 1994 (2007), that "[t]he parents enjoy enforceable rights at the administrative stage, and it would be inconsistent with the statutory scheme to bar them from continuing to assert these rights in federal court." *Winkelman*, 127 S.Ct. at 2002. The Court stated in part:

> . . . IDEA, through its text and structure, creates in parents an independent stake not only in the procedures and costs implicated by this process but also in the substantive decisions to be made. We therefore conclude that IDEA does not differentiate, through isolated references to various procedures and remedies, between the rights accorded to children and the rights accorded to parents. As a consequence, a parent may be a "party aggrieved" for purposes of § 1415(i)(2) with regard to "any matter" implicating these rights. See § 1415(b)(6)(A). The status of parents as parties is not limited to matters that relate to procedure and cost recovery. To find otherwise would be inconsistent with the collaborative framework and expansive system of review established by the Act.

*Id.* at 2004.

Accordingly, paragraph 143 of plaintiffs' Second Amended Complaint, which claims that Kelly D. Grieco and Michael Grieco are "aggrieved parties," is sufficient in conjunction with the substantive claims asserted by their son to state a claim pursuant to *Winkelman*. *Id.*

VI.

The Court finds nothing in the IDEA to support a private right of action on behalf of the organizational plaintiffs. The IDEA focuses on the rights of children and their parents. Plaintiffs have pointed to nothing in the statute that would give standing to the organizational plaintiffs. In this case, the litigation does not benefit from their participation as parties. Greico can present the same evidence in terms of witnesses, documents, and experts as the organizational plaintiffs. Their participation will only bring about cumulative evidence. The Court takes note that the interests of the organizational plaintiffs and individual plaintiffs are being represented by the same attorney. As the litigation moves forward, the interests of these plaintiffs may differ giving rise to a potential conflict. In lieu of participation, the Court will allow the organizational parties to file briefs *amicus curiae* upon application.

VII.

With regard to the officials, both state and township, named in their official capacities, the Court finds *Irene B. v. Philadelphia Academy Charter School*, 2003 WL 24052009 *9 (E.D.Pa. 2003), instructive and, thus, the individual defendants, named in their official capacities, are dismissed. In that case, the district court, *sua sponte*, raised the issue of the duplicative and cumbersome nature of plaintiffs' claims against Defendant Philadelphia Academy Charter School and the defendant principal in his official capacity. Citing to the U.S. Supreme Court, the court noted that "the real party in interest in an official-capacity suit is the government entity itself and not

the named official." *Hafer v. Melo*, 502 U.S. 21, 25, 112 S.Ct. 358, 116 L.Ed.2d 301 (1992); see *Brandon v. Holt*, 469 U.S. 464, 471-72, 105 S.Ct. 873, 83 L.Ed.2d 878 (1985) ("judgment against a public servant 'in his official capacity' imposes liability on the entity that he represents...."). "Since official-capacity suits generally represent only another way of pleading an action against an entity of which the officer is an agent," *Monell v. Department of Social Services of City of New York*, 436 U.S. 658, 691 n. 55, 98 S.Ct. 2018 (1978), it is appropriate to dismiss the claims against the individuals in their official capacities and retain the claims against the real party in interest. *Irene B. v. Philadelphia Academy Charter School*, 2003 WL 24052009 *9 (E.D.Pa. 2003). However, considering the nature of relief sought and the manner of enforcement of any future court order, the Court will retain the claims as to Lucille E. Davy, as Acting Commissioner of Education for the New Jersey State Board of Education, and Joseph Kraemer, as Acting Superintendent for Jefferson Township. All other individuals named in their individual capacities are dismissed.

## VIII.

The State maintains that the real party in interest in the first count, which concerns Grieco's individual placement, is the Township, and not the State. It is argued that the NJDOE is not responsible for providing direct services to students unless a school is found to be unable or unwilling to provide such service, which is not the case here. Additionally, the State Defendants maintain that they do not have any authority to modify an administrative law judge's decision resulting from a due process hearing. Lastly, it is asserted the NJDOE has no stake in the outcome of any particular hearing and is not a necessary party to obtain the relief sought by Grieco. The State Defendants cite to three cases out of the District Court for the District of Columbia for support. *See Friendship Edison Public Charter School Chamberlain Campus v. Smith ex rel. L.S.*, 429 F.Supp.2d

195 (D.D.C. 2006); *Idea Pub. Charter Sch. v. Belton*, 2006 WL 667072 (D.D.C. 2006); *Hyde Leadership Pub. Charter Sch. v. Clark*, 424 F.Supp.2d 58 (D.D.C. 2006).

Plaintiffs argue that the State's assertion of a "hands off" policy toward local educational matters is at the very root of the issues in this case. However, plaintiffs cite no authority for holding the State responsible for the allegations asserted in the first count of the Second Amended Complaint.

The real party in interest as to the first count is the Jefferson Defendants.

IX.

In summary, the claims of Plaintiffs Boucher and Bricese, and their parents, are dismissed without prejudice, for failure to exhaust administrative remedies. The organizational plaintiffs are dismissed, with prejudice, but upon application to the Court may file briefs *amicus curiae*, should they so choose. All individual defendants named in their official capacities are dismissed with the exception of Lucille E. Davy, as Acting Commissioner of Education for the New Jersey State Board of Education, and Joseph Kraemer, as Acting Superintendent for Jefferson Township. The claims set forth in Count 1 are dismissed as to the State Defendants only. Plaintiff Grieco, and his parents, may proceed on all counts; however, the subject of this plaintiff's claim in Counts Two through Five are limited solely to his 2004-2005 school year, for which Grieco exhausted his administrative remedies.

June 27, 2007
                                            *s/Peter G. Sheridan*
                                            PETER G. SHERIDAN, U.S.D.J.